**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Catherine A. Strain, | : | Case No. 5:12 CV 1368 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| Defendant, | : | **RECOMMENDATION** |

### I. INTRODUCTION

Plaintiff Catherine A. Strain ("Plaintiff") seeks judicial review, pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§§ 416(i), 423, and 1381 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 15 and 16) and Plaintiff's Response (Docket No. 17). For the reasons that follow, the Magistrate recommends that the decision of the Commissioner be affirmed.

1

## II. PROCEDURAL BACKGROUND

On June 2, 2008, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 11, p. 190 of 1433). On that same day, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 11, p. 187 of 1433).[1] In both applications, Plaintiff alleged a period of disability beginning May 22, 2008 (Docket No. 11, pp. 187, 190 of 1433). Plaintiff's claims were denied initially on August 27, 2008 (Docket No. 11, pp. 109, 113 of 1433), and upon reconsideration on December 9, 2008 (Docket No. 11, pp. 117, 120 of 1433). Plaintiff thereafter filed a timely written request for a hearing on December 28, 2008 (Docket No. 11, p. 123 of 1433).

On July 8, 2010, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Kendra S. Kleber ("ALJ Kleber") (Docket No. 11, pp. 37-79 of 1433). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 11, p. 37 of 1433). ALJ Kleber found Plaintiff to have a severe combination of degenerative disc disease of the cervical spine, depression, anxiety, obesity, impairment of her bilateral upper extremities related to a history of deep vein thrombosis and pulmonary embolism, reflex sympathetic dystrophy of the right hand, and bilateral carpal tunnel syndrome, with an onset date of May 22, 2008 (Docket No. 11, pp. 16-17 of 1433).

Despite these limitations, ALJ Kleber determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the

---

[1] Plaintiff initially filed for DIB on August 22, 1996, alleging a disability beginning September 6, 1995 (Docket No. 11, p. 84 of 1433). Plaintiff's claim was denied initially and upon reconsideration (Docket No. 11, p. 84 of 1433). This denial was affirmed and became the final decision of the Commissioner following an administrative hearing (Docket No. 11, p. 92 of 1433). Plaintiff also applied for DIB and SSI on March 3, 2005, citing a disability onset date of February 8, 2005 (Docket No. 11, pp. 178, 184 of 1433). There is no information in the record as to what happened to these applications. Based on Plaintiff's current application, it is presumed the 2005 requests were denied.

alleged onset date through the date of her decision (Docket No. 11, p. 28 of 1433). ALJ Kleber found

Plaintiff had the residual functional capacity to perform light work with the following exceptions:

1. No operation of hand controls, climbing of ladders or scaffolds, or balancing
2. Only occasional stooping, kneeling, crouching, and crawling
3. Only simple tasks, defined as having only one to three steps, each describable in one sentence
4. Work must be goal oriented, as opposed to production-rate pace work
5. No interaction with the public, which is defined as contact that is less than two (2) minutes at a time for no more than thirty (30) minutes of the workday
6. No more than occasional contact with co-workers, defined as being around co-workers for less than ten (10) minutes at a time for no more than one-third (1/3) of the workday

(Docket No. 11, p. 20 of 1433). ALJ Kleber found Plaintiff unable to perform any of her past relevant

work, but able to perform other work in the economy (Docket No. 11, p. 27 of 1433). Plaintiff's

request for benefits was therefore denied (Docket No. 11, p. 28 of 1433).

On May 31, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern

Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading,

Plaintiff alleged the ALJ erred by violating the treating physician rule and by failing to properly

incorporate limitations into her assessment of Plaintiff's residual functional capacity (Docket No. 15).

Defendant filed its Answer on August 8, 2012 (Docket No. 10).

### III. FACTUAL BACKGROUND

**A. THE ADMINISTRATIVE HEARING**

An administrative hearing convened on July 8, 2010, in Cleveland, Ohio (Docket No. 11, pp.

37-79 of 1433). Plaintiff, represented by counsel Michael Malyuk, appeared and testified (Docket No.

11, p. 39 of 1433). Also present and testifying was VE Nancy J. Borgeson ("VE Borgeson") (Docket

No. 11, p. 39 of 1433).

**1. PLAINTIFF'S TESTIMONY**

3

At the time of the hearing, Plaintiff was a forty-eight year old female with a high school education (Docket No. 11, pp. 27, 222 of 1433). Plaintiff testified that she most recently worked in medical billing, but last worked on May 22, 2008 (Docket No. 11, pp. 42-43 of 1433). When asked what her biggest employment obstacle was, Plaintiff indicated that she suffered from problems with her back, neck, arms, and hands, as well as an inability to stand for long periods of time (Docket No. 11, p. 43 of 1433). Plaintiff testified that she could not return to her previous job in medical billing because she would be required to sit and type for at least eight hours per day (Docket No. 11, p. 64 of 1433). Plaintiff lives alone and can drive (Docket No. 11, pp. 59-61 of 1433).

Plaintiff gave testimony concerning a number of her alleged impairments, including her leg, back, and arm pain, her migraine headaches, and her mental health issues (Docket No. 11, pp. 44-65 of 1433). Plaintiff also provided a list of her current medications, which include Percocet (for back pain), Neurontin (for back and leg pain), Zoloft and Ativan (for anxiety and depression), Trazodone (sleeping pill), Phenergan (for nausea), Steraline (for blood pressure), and Coumadin (for deep vein thrombosis) (Docket No. 11, pp. 45-57 of 1433). Plaintiff indicated that these medications do not cause side effects and do help to alleviate her pain (Docket No. 11, p. 65 of 1433).

With regard to her leg pain, Plaintiff indicated that she suffers from restless leg syndrome ("RLS")[2] stemming from severe degenerative disc disease (Docket No. 11, p. 44 of 1433). Plaintiff described the pain as being "achy" in nature, and stated that everything felt very tight and she could hear "ripping" in her kneecaps (Docket No. 11, p. 44 of 1433). Plaintiff's leg pain is constant and is more troublesome in her right leg than her left, but usually only occurs when she is standing up

---

[2] Restless leg syndrome is a condition of unknown cause marked by an intolerable creeping sensation or itching in the lower extremities and causing an almost irresistible urge to move the legs. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

(Docket No. 11, pp. 44-45 of 1433). According to Plaintiff, she only occasionally suffers leg pain when she is sitting down with her legs reclined (Docket No. 11, p. 44 of 1433). Plaintiff indicated that the pain is always in the same place, starting in her lower back and radiating through her thighs, stopping at her kneecaps (Docket No. 11, p. 45 of 1433). At the hearing, Plaintiff was using a cane, reportedly for her balance issues and frequent falls (Docket No. 11, p. 46 of 1433). Plaintiff testified that she falls if she bends down and gets up too fast or if she turns too fast (Docket No. 11, p. 46 of 1433). Plaintiff indicated that her falls have become more frequent, with the most recent incident being a week and a half before the hearing when she fell at her daughter's house when not using her cane (Docket No. 11, p. 47 of 1433).

In describing her back pain, Plaintiff stated that it occurs in both her upper and lower back and radiates to her neck (Docket No. 11, p. 48 of 1433). Plaintiff indicated that the pain was related to her severe degenerative disc disease, spinal stenosis, and fusion surgery (Docket No. 11, p. 49 of 1433). Plaintiff indicated that the pain becomes so intense it prevents her from getting out of bed and, even when she can get out of bed, it is "a process" (Docket No. 11, p. 49 of 1433). Plaintiff testified that she can get in and out of her shower using the shower bar, and can also get in and out of her car (Docket No. 11, pp. 49-50 of 1433). She cannot stand for long periods of time, and indicated that, even when she washes dishes, she has to lean on the counter (Docket No. 11, p. 49 of 1433). According to Plaintiff, she has days, usually three to four per week, when she can barely move (Docket No. 11, p. 65 of 1433).

With regard to her arm pain, Plaintiff testified that she feels she is totally losing control of her right arm, finding it difficult to pick things up and brush her teeth and hair (Docket No. 11, p. 55 of 1433). Plaintiff had carpal tunnel surgery, but indicated that her pain is still horrible, describing it as

5

"ripping and tearing, swelling, [and] redness" (Docket No. 11, p. 56 of 1433). Plaintiff also indicated that physical therapy did nothing but make her pain worse (Docket No. 11, pp. 56-57 of 1433).

When asked about her migraine headaches, Plaintiff stated that they were not currently as bad as they were before her brain surgery in 2005 (Docket No. 11, p. 58 of 1433). She indicated that she has continued to suffer with balance and dizziness problems, even after the surgery, although she does not feel like she loses her balance while driving (Docket No. 11, pp. 58-59 of 1433). Plaintiff also testified that she suffers from anxiety, panic attacks, and depression, but is not receiving any treatment for these issues due to a lack of insurance (Docket No. 11, p. 52 of 1433). Plaintiff indicated that she suffers from panic attacks at least five days per week, but could not identify any specific trigger (Docket No. 11, p. 53 of 1433). She stated that her most recent panic attack occurred on her way to the administrative hearing (Docket No. 11, p. 52 of 1433). She described the attack by stating "everything just looks like it's closing in on you" (Docket No. 11, p. 53 of 1433).

ALJ Kleber also questioned Plaintiff about her residual functional capacity. Plaintiff indicated that she could stand up for ten minutes before needing a break, maybe longer if she could lean on something to alleviate her pain (Docket No. 11, pp. 59-60 of 1433). Plaintiff testified that she could walk for fifteen to twenty minutes before needing to sit and rest for a period of five to ten minutes (Docket No. 11, p. 60 of 1433). Plaintiff stated that she does her own grocery shopping, and, while she was usually in the store for only ten minutes, indicated that she could probably last for thirty minutes if she was leaning on the shopping cart (Docket No. 11, pp. 60-61 of 1433). With regard to lifting and carrying, Plaintiff indicated that she could lift a gallon of milk if she hugged it to her chest, and could pick up a gallon of milk and a can of soda with her left hand, but not her right (Docket No. 11, pp. 62-63 of 1433). Plaintiff testified that she does not do any of her own housekeeping and that her daughter

6

helps her with her laundry, namely folding the clothes and carrying them upstairs (Docket No. 11, p. 76 of 1433). Plaintiff stated that she could do her own dishes, but it sometimes takes her two days because of her pain (Docket No. 11, p. 76 of 1433).

### 2.    VOCATIONAL EXPERT TESTIMONY

Having familiarized herself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a medical biller as sedentary and semi-skilled, and her past work as a front-end coordinator of a grocery store as light and semi-skilled/low-skilled (Docket No. 11, pp. 68-69 of 1433). The VE also mentioned Plaintiff's past work as an educational aide but stated that this work did not rise to the level of substantial gainful activity since Plaintiff only worked two hours per day (Docket No. 11, p. 69 of 1433).

ALJ Kleber then posed her first of three hypothetical questions:

> . . . imagine if you would please, a person of the age, education and work experience of the Claimant, whose ability to perform light work is limited, in that she is unable to . . . use hand controls; limited to no more than occasional climbing or stairs or ramps; no climbing of ladders or scaffolds; and never to be exposed to hazards, such as unprotected heights or industrial machinery; and never to be in a position . . . of balancing. . . . Now would such a person be able to perform any of the Claimant's past work?

(Docket No. 11, p. 69 of 1433). Taking into account these limitations, the VE testified that such an individual would be able to perform both Plaintiff's medical billing and front-end coordinating jobs (Docket No. 11, p. 70 of 1433).

ALJ Kleber then posed a second hypothetical question:

> . . . now assume that our hypothetical person has the additional limitations of physically no more than occasionally ever able to stoop, kneel, crouch, or crawl [,and] is limited to simple tasks defined as being those of one to three steps, each describable in just one sentence; needs goal-oriented work as opposed to production-rate piece work; and needs a work setting that involves no interaction with the public, and that's defined as being around members of the public during the workday, but only for contact of less than 2 minutes at a time, for no more than 30 minutes total of the day; and no more than

7

occasional contact with coworkers, defined as being around coworkers during the workday but only for contact of less than 10 minutes at a time for no more than one-third of the day. Now would such a person be able to perform the Claimant's past work?

(Docket No. 11, p. 70 of 1433). Given those limitations, the VE testified that such an individual would not be able to perform Plaintiff's past work (Docket No. 11, p. 70 of 1433). The VE stated that there was other work that the hypothetical person could perform, including: (1) mail clerk, listed under DOT 209.687-026, for which there are 139,000 positions nationally and 7,000 in the State of Ohio; (2) laundry worker, listed under DOT 361.685-018, for which there are 75,000 positions nationally and 3,000 in the State of Ohio; and (3) cleaner/housekeeping (light), listed under DOT 323.687-014, for which there are 1,000,000 positions nationally and 12,000 in the State of Ohio (Docket No. 11, p. 71 of 1433).

ALJ Kleber then proposed an additional limitation to the hypothetical allowing the hypothetical person to only use her dominant hand to "assist for lifting or carry, no use for fingering, and as an assist for handling of large stuff" (Docket No. 11, p. 72 of 1433). With this added limitation, the VE indicated that the hypothetical person would not be able to perform either the laundry worker or the cleaner/housekeeping positions (Docket No. 11, pp. 72-73 of 1433).

During cross-examination, Plaintiff's counsel inquired as to what would happen if, in addition to the ALJ's limitations, the hypothetical claimant also required the use of a cane (Docket No. 11, p. 74 of 1433). The VE indicated that this limitation would prohibit the claimant from doing any of the other work previously offered (Docket No. 11, p. 74 of 1433). Counsel then removed the use of a cane from his hypothetical, but added the need for an at-will sit/stand option (Docket No. 11, p. 74 of 1433). With this limitation, the VE again indicated that the claimant would be prohibited from performing any of the other work (Docket No. 11, pp. 74-75 of 1433). Counsel removed the sit/stand limitation and

added only occasional lifting (Docket No. 11, p. 75 of 1433). The VE indicated that the claimant would not be able to perform the laundry worker or cleaner/housekeeping jobs, but could likely perform the mail clerk position (Docket No. 11, p. 75 of 1433). Finally, counsel added the limitation of being off task at least fifteen percent (15%) of the time due to a need to lie down or take a break (Docket No. 11, p. 75 of 1433). The VE indicated that this would prohibit the claimant from doing any of the other work previously mentioned (Docket No. 11, pp. 75-76 of 1433).

## B.   MEDICAL RECORDS

Plaintiff's medical records regarding her back and neck pain date back to April 5, 2000, when Plaintiff went to the Akron General Hospital Emergency Room ("Akron General ER" or "ER") complaining of back pain (Docket No. 11, p. 576 of 1433). At the time, Plaintiff was working as an educational aide in a school and alleged that a student grabbed her from behind, causing an exacerbation of a back injury previously suffered at the school (Docket No. 11, p. 576 of 1433). Plaintiff was diagnosed with a back strain and prescribed Vicodin for the pain (Docket No. 11, pp. 576-77 of 1433). Approximately one week later, Plaintiff saw Dr. James Kennedy, MD ("Dr. Kennedy") for her pain (Docket No. 11, p. 279 of 1433). Dr. Kennedy noted that Plaintiff had severe pain and diagnosed her with a cervical and thoracic strain, as well as neuritis[3] (Docket No. 11, p. 279 of 1433).

On August 14, 2000, Plaintiff saw Dr. Anthony Battaglia ("Dr. Battaglia") complaining of neck pain and stiffness as well as lower back pain with intermittent radiating symptoms in her right leg (Docket No. 11, p. 552 of 1433). Plaintiff rated her pain at a level nine out of a possible ten (Docket

---

[3] Neuritis is inflammation of a nerve, usually associated with a degenerative process. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

9

No. 11, p. 553 of 1433). Dr. Battaglia suggested Plaintiff try physical therapy (Docket No. 11, p. 554 of 1433). Plaintiff began this therapy on September 20, 2000 (Docket No. 11, p. 534 of 1433). At her initial appointment, therapy staff noted that Plaintiff had marked tenderness along her lower lumbosacral paraspinals as well as a mild focal median neuropathy of her right wrist with mild carpal tunnel (Docket No. 11, p. 534 of 1433). Plaintiff was prescribed physical therapy three times per week (Docket No. 11, p. 534 of 1433).

Plaintiff's medical records then jump to August 2004 with only a brief mention of Plaintiff's improved condition in March 2002 (Docket No. 11, p. 577 of 1433). On August 27, 2004, Plaintiff was diagnosed with a small brain tumor, approximately two centimeters wide, on her fourth ventricle (Docket No. 11, p. 1168 of 1433). On September 23, 2004, Plaintiff met with Dr. Dane Donich, MD ("Dr. Donich"), a neurosurgeon, who confirmed the presence of the brain tumor (Docket No. 11, pp. 466, 1005, 1030, 1166 of 1433).

On November 3, 2004, Plaintiff presented to the Akron General ER complaining of abdominal pain (Docket No. 11, p. 416 of 1433). Plaintiff was diagnosed with peritonitis and a perforated bowel and was admitted to the hospital and placed on intravenous fluids (Docket No. 11, pp. 416, 425 of 1433). Plaintiff was discharged from the hospital six days later, on November 9, 2004 (Docket No. 11, p. 426 of 1433).

Plaintiff returned to the Akron General ER on November 12, 2004, complaining of bilateral arm pain, which she alleged had been present since her recent hospital stay (Docket No. 11, p. 388 of 1433). A scan showed Plaintiff was suffering from a right superficial and deep basilica deep vein

10

thrombosis ("DVT")[4] as well as a left partial DVT (Docket No. 11, p. 388 of 1433). Plaintiff was started on a Coumadin regimen to thin her blood (Docket No. 11, p. 393 of 1433). A CT scan also revealed a lobar pulmonary embolism[5] with saddle involvement (Docket No. 11, p. 405 of 1433). A bilateral upper extremity vascular ultrasound showed moderately extensive intraluminal thrombus (Docket No. 11, p. 406 of 1433).

On November 20, 2004, Plaintiff visited the Akron General ER complaining of numbness in her forehead (Docket No. 11, p. 377 of 1433). It was also noted that Plaintiff had a tenderness to palpation in her left perilumbar and midline lumbar region (Docket No. 11, p. 377 of 1433). Hospital staff performed a head CT, which was normal except for the previously diagnosed tumor (Docket No. 11, pp. 376, 384 of 1433). It was determined that Plaintiff was likely experiencing anxiety-related numbness (Docket No. 11, p. 377 of 1433). On January 25, 2005, doctors recommended Plaintiff undergo a sub-occipital craniotomy for the resection of her brain tumor (Docket No. 11, p. 343 of 1433). Dr. Donich performed this resection on February 9, 2005 (Docket No. 11, pp. 345, 1048, 1184 of 1433).

On March 2, 2005, Plaintiff returned to Dr. Donich complaining of severe vertigo (Docket No. 11, p. 326 of 1433). At the time, she was not using a cane or any other assistive device, but Dr. Donich noted that she had a very cautious gait pattern (Docket No. 11, p. 326 of 1433). He recommended therapeutic exercise and general strengthening activities (Docket No. 11, p. 327 of 1433). At an appointment on March 10, 2005, Dr. Donich reported that Plaintiff was doing very well (Docket No.

---

[4] Deep vein thrombosis is a blood clot in one or more of the deep veins of the legs or the veins of arms, pelvis, neck, axilla, or chest. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

[5] A pulmonary embolism is an obstruction of the pulmonary artery or one of its branches, usually caused by an embolus from a blood clot in a lower extremity. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

11, p. 1003 of 1433).

On March 29, 2005, Plaintiff presented to the Akron General ER reporting that she had awakened with pain behind her left ear which then progressed to numbness (Docket No. 11, p. 331 of 1433). A CT scan of her head revealed no abnormal findings (Docket No. 11, pp. 330, 339 of 1433). The area over Plaintiff's surgery scar was very tender to palpation, but Plaintiff possessed a normal gait and walked without a cane (Docket No. 11, p. 332 of 1433). By April 19, 2005, Plaintiff had been discharged from physical therapy for non-attendance (Docket No. 11, p. 468 of 1433).

Plaintiff's records then jump to December 2006 and Plaintiff's first visit with Dr. Kelli Sabin ("Dr. Sabin") (Docket No. 11, pp. 1023, 1159 of 1433). Plaintiff reported six months of neck pain and Dr. Sabin ordered an MRI (Docket No. 11, pp. 1023, 1159 of 1433). The scan revealed severe degenerative disc disease with foraminal stenosis due to bony spurring at Plaintiff's C5-6 and C6-7 vertebrae (Docket No. 11, pp. 1023, 1159 of 1433).

On February 12, 2007, Plaintiff returned to Dr. Donich after nearly a one-year absence from his care (Docket No. 11, pp. 999, 1135 of 1433). Plaintiff complained of cervical spine and lower back pain as well as some episodes of muscular spasms, occasional dizziness, headaches, diminished sensation in her hands bilaterally, and radiating lower back pain (Docket No. 11, pp. 999, 1135 of 1433). At that time, Plaintiff reported her pain as "moderate" and stated that she was able to walk at least one-quarter of a mile (Docket No. 11, pp. 999, 1135 of 1433). Dr. Donich noted a diminished range of motion in Plaintiff's cervical and lumbar spine regions and noted her strength level to be four of out a possible five (Docket No. 11, pp. 999, 1135 of 1433). Dr. Donich also noted significant degenerative changes of Plaintiff's C5-6 and C6-7 vertebrae and reported possible cervical radiculopathy and neural compressions (Docket No. 11, pp. 999, 1135 of 1433).

12

Later that same day, Plaintiff presented to the Akron General ER complaining of abdominal pain that woke her up (Docket No. 11, p. 797 of 1433). Plaintiff underwent a CT scan, which was normal, and Plaintiff was discharged (Docket No. 11, pp. 799, 808, 904, 914 of 1433).

On February 26, 2007, Plaintiff returned to Dr. Sabin complaining of abdominal pain (Docket No. 11, p. 841 of 1433). Plaintiff was diagnosed with constipation and epigastric abdominal pain (Docket No. 11, p. 841 of 1433). The next day, Plaintiff underwent a nerve conduction study of her upper extremities, which revealed mostly normal findings except for a significant delay in median nerve peak latency in her right arm (Docket No. 11, pp. 1007, 1143 of 1433). On that same date, Dr. Donich conducted an MRI of Plaintiff's cervical spine (Docket No. 11, pp. 1020, 1156 of 1433). The scan revealed a broad-based and left-sided herniation of the C5-6 vertebrae (Docket No. 11, pp. 1020, 1156 of 1433). Plaintiff was also diagnosed with a predominantly central herniation of her disc material at the C6-7 vertebrae (Docket No. 11, pp. 1020, 1156 of 1433).

Plaintiff returned to Dr. Donich one month later on March 22, 2007, complaining of transient "kaleidoscope" vision as well as cervical spine pain that was radiating into her bilateral upper extremities (Docket No. 11, pp. 913, 997, 1133 of 1433). Dr. Donich noted that Plaintiff had diminished range of motion in her cervical spine and mildly impaired fine motor coordination in her hands, which suggested mild carpal tunnel syndrome (Docket No. 11, pp. 913, 997, 1133 of 1433). Plaintiff was diagnosed with significant disc protrusions with associated spondylitic changes at her C5-6 and C6-7 vertebrae that resulted in some cord compression and foraminal stenosis (Docket No. 11, pp. 913, 997, 1133 of 1433).

On April 17, 2007, Plaintiff was diagnosed with a central bulging of her C3-4 vertebrae and left-sided spurring contributing to moderate canal and foraminal narrowing at her C5-6 vertebrae

13

(Docket No. 11, pp. 1018, 1154 of 1433). On April 25, 2007, Plaintiff saw Dr. Richard Dera, Jr., MD ("Dr. Dera") complaining of right arm pain, specifically in her elbow (Docket No. 11, p. 836 of 1433). Dr. Dera diagnosed Plaintiff with epicondylitis[6] (Docket No. 11, p. 837 of 1433).

On May 8, 2007, Plaintiff underwent a C5-6 anterior cervical decompression fusion and plating (Docket No. 11, pp. 775, 1042, 1178 of 1433). On May 11, 2007, Plaintiff reported to the Akron General ER complaining of left arm pain as well as swelling (Docket No. 11, pp. 757, 941, 1039, 1175 of 1433). Plaintiff's strength was five out of a possible five, but an ultrasound revealed a positive basilica and brachial DVT (Docket No. 11, pp. 758, 896, 897 of 1193). Plaintiff was admitted and started anticoagulation therapy while receiving a Heparin drip (Docket No. 11, p. 765 of 1433). Plaintiff was discharged on May 16, 2007 (Docket No. 11, pp. 765, 941 of 1433).

Plaintiff returned to Dr. Donich on May 21, 2007 (Docket No. 11, p. 996 of 1433). At that time, Dr. Donich noted that Plaintiff was doing "dramatically" better than she was preoperatively, and her strength was at level four out of a possible five (Docket No. 11, p. 996 of 1433). On May 29, 2007, Plaintiff saw Dr. Kimberly Frazer, MD ("Dr. Frazer") and complained of lumps on her left arm and shoulder (Docket No. 11, p. 832 of 1433). Plaintiff was diagnosed with venous thrombosis NOS and myalgia (Docket No. 11, p. 832 of 1433).

On July 3, 2007, Plaintiff saw Dr. Sabin and underwent an ultrasound of her kidneys to test for hematuria[7] (Docket No. 11, p. 745 of 1433). The scan was normal (Docket No. 11, pp. 745, 894 of 1433). On July 5, 2007, Plaintiff presented to the Akron General ER complaining of vertigo (Docket

---

[6] Epicondylitis is defined as inflammation of the epicondyle of the humerus and surrounding tissues. In laymen's terms, tennis elbow. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

[7] Hematuria is defined as the presence of blood or red blood cells in the urine. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

No. 11, pp. 738, 935 of 1433). It was noted that Plaintiff had a limited range of motion *only because she said so*, not because her range of motion was physically or mechanically abnormal (Docket No. 11, p. 739 of 1433). Plaintiff's examination was normal and she was discharged (Docket No. 11, p. 738 of 1433).

On July 27, 2007, Plaintiff returned to Dr. Sabin complaining of mid-back pain (Docket No. 11, p. 828 of 1433). Dr. Sabin noted that Plaintiff was experiencing a paraspinal muscle spasm that was restricting her range of motion (Docket No. 11, p. 829 of 1433). Plaintiff was diagnosed with carpal tunnel syndrome and muscle spasms (Docket No. 11, p. 829 of 1433). Only three days later, on July 30, 2007, Plaintiff saw Dr. Melissa D. Young, MD ("Dr. Young"), complaining of bilateral upper extremity pain and numbness (Docket No. 11, p. 909 of 1433). Dr. Young noted that Plaintiff had some mild limitation in her left wrist flexion, but reported that her forearm and elbow range of motion was normal (Docket No. 11, p. 909 of 1433). Plaintiff's grip strength was limited bilaterally, although more pronounced on the right than the left (Docket No. 11, p. 909 of 1433). Plaintiff was also exquisitely tender over both elbows and down into her forearms (Docket No. 11, pp. 909-10 of 1433). However, her strength was five out of a possible five bilaterally (Docket No. 11, pp. 909-10 of 1433). Dr. Young diagnosed Plaintiff with bilateral epicondylitis, radial tunnel syndrome, and chronic myofacial pain, but deemed her ineligible for surgery (Docket No. 11, p. 910 of 1433).

In an August 23, 2007, visit with Dr. Donich, Plaintiff stated that she was "not doing well," and complained of severe cervical spine pain radiating into her right upper extremities (Docket No. 11, p. 994 of 1433). Plaintiff also complained of debilitating lumbar pain that radiated bilaterally into her gluteal muscles (Docket No. 11, p. 994 of 1433). Dr. Donich noted a severely impaired range of motion in Plaintiff's cervical and lumbar spine region as well as diminished coordination in both hands

15

(Docket No. 11, p. 994 of 1433). A September 6, 2007, MRI revealed mild left-sided foraminal narrowing at Plaintiff's L4-5 vertebrae (Docket No. 11, pp. 1014, 1150 of 1433). However, by September 24, 2007, Plaintiff was doing "dramatically" better with regard to her cervical spine and was no longer experiencing any neck, shoulder, or radicular pain in her upper extremities (Docket No. 11, pp. 992, 1128 of 1433). Dr. Donich recommended lumbar blocks for Plaintiff's lumbar spine pain (Docket No. 11, pp. 992, 1128 of 1433). Plaintiff underwent a transforaminal block and an epidural block on her L4-5 vertebrae on October 22, 2007, November 12, 2007, and November 26, 2007 (Docket No. 11, pp. 987, 990, 1126 of 1433).

On December 18, 2007, Plaintiff presented to the Akron General ER complaining of abdominal pain (Docket No. 11, pp. 708, 929, 931 of 1433). An ultrasound revealed a probable cyst in her right ovary (Docket No. 11, p. 887 of 1433). Plaintiff returned to the ER on December 20, 2007, again complaining of abdominal pain (Docket No. 11, pp. 688, 925 of 1433). Plaintiff rated her pain as a "twenty out of a possible ten" (Docket No. 11, pp. 688, 925 of 1433). Doctors confirmed the presence of a small, 1.7-centimeter cystic mass on Plaintiff's right ovary (Docket No. 11, pp. 689, 691, 700, 702, 703, 886 of 1433).

On December 27, 2007, Plaintiff returned to Dr. Donich reporting an increase in her back pain, despite having received some relief after the lumbar blocks (Docket No. 11, pp. 986, 1124 of 1433). Plaintiff rated her pain as a seven to eight out of a possible ten (Docket No. 11, pp. 986, 1124 of 1433). Plaintiff stated that the pain radiated bilaterally to her hips, with her left side being worse than her right, although she stated that she felt that her right leg could just give out at any time (Docket No. 11, pp. 986, 1124 of 1433). Plaintiff also stated that she could walk one mile if she needed to (Docket No. 11, pp. 986, 1124 of 1433).

16

On January 9, 2008, Plaintiff underwent a left-sided carpal tunnel release (Docket No. 11, pp. 683, 1037, 1173 of 1433). During a follow-up appointment on February 8, 2008, Plaintiff reported that she was happy with the surgery and that she had "experienced significant resolution of her symptoms" (Docket No. 11, pp. 983, 1121 of 1433). On February 29, 2008, Plaintiff underwent a right-sided carpal tunnel release (Docket No. 11, pp. 676, 1035, 1171 of 1433). During a follow-up appointment on March 10, 2008, Dr. Donich indicated that Plaintiff was making a good recovery (Docket No. 11, pp. 981, 1119 of 1433).

On March 28, 2008, Plaintiff was diagnosed with RLS and epicondylitis (Docket No. 11, p. 822 of 1433). On April 1, 2008, Plaintiff saw Greg M. Schimmoeller ("Mr. Schimmoeller"), a physical therapist, for an initial evaluation (Docket No. 11, p. 906 of 1433). Mr. Schimmoeller noted that Plaintiff had a moderately decreased lumbar range of motion, decreased strength in her trunk and bilateral lower extremities, decreased posture and body mechanics, and a decreased gait and balance (Docket No. 11, p. 906 of 1433). Plaintiff rated her pain ranging between seven and ten out of a possible ten (Docket No. 11, p. 906 of 1433). Mr. Schimmoeller noted that Plaintiff's rehabilitation potential was good and recommended a home exercise program as well as a regular aquatics routine (Docket No. 11, p. 908 of 1433).

On April 3, 2008, Plaintiff reported to the Akron General ER complaining of a left-sided occipital headache that had persisted for three days (Docket No. 11, pp. 655, 920 of 1433). Plaintiff described the pain as achy and constant, and noted a sensitivity to light (Docket No. 11, pp. 655, 920 of 1433). Plaintiff was given an occipital block and medication, which resolved her pain (Docket No. 11, p. 656 of 1433).

Plaintiff returned to the Akron General ER on April 23, 2008, complaining of left hand pain

17

(Docket No. 11, pp. 643, 918 of 1433). Plaintiff rated the pain as a ten out of a possible ten and stated that she was unable to hold a can of soda or her cell phone (Docket No. 11, pp. 643, 918 of 1433). Plaintiff had some mild swelling around her left thumb and had some difficulty with apposition on range of motion (Docket No. 11, pp. 643, 918 of 1433). An ultrasound was negative for DVT (Docket No. 11, pp. 644, 651 of 1433). On April 30, 2008, Plaintiff reported to CNS Healthcare Rehab ("CNS Rehab") to follow-up after her carpal tunnel surgery (Docket No. 11, p. 1230 of 1433). Plaintiff claimed that her right hand was not getting any better and stated that she still had difficulty holding any type of object (Docket No. 11, p. 1230 of 1433). By May 15, 2008, Plaintiff reported that the physical therapy was helping her "significantly" (Docket No. 11, pp. 979, 1117 of 1433).

On May 19, 2008, Plaintiff reported to Dr. Sabin complaining of a migraine (Docket No. 11, p. 818 of 1433). Plaintiff was given Imitrex and Phenergan (Docket No. 11, p. 819 of 1433). A few days later, on May 23, 2008, Plaintiff reported to the Akron General ER complaining of a left-sided headache (Docket No. 11, p. 917 of 1433). Plaintiff was significantly tender in her left occipital nuchal region[8] (Docket No. 11, p. 917 of 1433). She was given an occipital nerve block, which resolved her symptoms (Docket No. 11, p. 917 of 1433).

On May 25, 2008, Plaintiff saw physician's assistant Amy C. Newman ("Ms. Newman") (Docket No. 11, p. 824 of 1433). Ms. Newman noted that Plaintiff's back had a normal range of motion and no tenderness, but reported the presence of RLS (Docket No. 11, pp. 824-25 of 1433). During a July 15, 2008, appointment at CNS Rehab, Plaintiff rated her hand pain as an eight out of a possible ten (Docket No. 11, p. 1205 of 1433). At some point during her rehabilitation, Plaintiff

---

[8] This region is defined as the nape (back) of the neck. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

received a transcutaneous electrical nerve stimulation ("TENS") unit, which she returned on July 30, 2008, despite stating that the device helped with seventy-five percent (75%) of her pain (Docket No. 11, p. 1196 of 1433). Plaintiff was officially discharged from physical therapy on August 1, 2008, given her inconsistent session attendance (Docket No. 11, p. 1197 of 1433).

On November 14, 2008, Plaintiff returned to the Akron General ER complaining of abdominal pain (Docket No. 11, p. 1392 of 1433). Hospital records indicate that Plaintiff was convinced that she had a bowel obstruction (Docket No. 11, p. 1392 of 1433). Plaintiff was given Dilaudid, but also requested Morphine (Docket No. 11, p. 1393 of 1433). One month later, Plaintiff returned to the ER complaining of the "worst headache of her life" (Docket No. 11, p. 1373 of 1433). Plaintiff reported no changes in her vision or any acute neurological problems and had a normal brain CT scan (Docket No. 11, p. 1373 of 1433). Hospital staff wanted to do a lumbar puncture to rule out a subarachnoid hemorrhage, but Plaintiff refused and instead requested pain medication (Docket No. 11, p. 1374 of 1433). Plaintiff was diagnosed with a likely viral infection (Docket No. 11, p. 1374 of 1433).

Plaintiff returned to the Akron General ER on February 17, 2009, complaining of abdominal pain (Docket No. 11, p. 1361 of 1433). Hospital records indicate that Plaintiff had no cervical motion tenderness (Docket No. 11, p. 1361 of 1433). Plaintiff was given pain medication, which resolved her issue (Docket No. 11, p. 1362 of 1433). Plaintiff again presented to the Akron General ER on May 28, 2009, complaining of right hand pain (Docket No. 11, p. 1354 of 1433). Plaintiff was discharged and told to follow-up with her regular doctors (Docket No. 11, p. 1354 of 1433).

Plaintiff returned to the ER approximately two weeks later on June 12, 2009, still complaining of right hand numbness and weakness (Docket No. 11, p. 1349 of 1433). Plaintiff stated that she was not using her nighttime hand splints as directed (Docket No. 11, p. 1349 of 1433). Staff noted a

tenderness upon palpation on Plaintiff's fourth and fifth fingers, but noted that she was able to flex her neck to touch her chin to her chest and able to rotate her head completely to the left but experienced some limitation when rotating to the right (Docket No. 11, p. 1350 of 1433). Plaintiff's hand strength was five out of a possible five bilaterally (Docket No. 11, p. 1350 of 1433). Plaintiff was given an injection of one percent (1%) lidocaine and discharged (Docket No. 11, p. 1350 of 1433).

On August 14, 2009, Plaintiff presented to the Akron General ER complaining of bilateral wrist and elbow pain along with numbness (Docket No. 11, p. 1347 of 1433). Plaintiff was tender to palpation over her carpal tunnel surgery incision (Docket No. 11, p. 1347 of 1433). A Finkelstein test[9] was negative (Docket No. 11, p. 1347 of 1433). Staff indicated that they had "a long discussion . . . with the patient regarding the etiology of her symptoms" (Docket No. 11, p. 1347 of 1433).

Plaintiff returned to the Akron General ER on November 13, 2009, again complaining of bilateral wrist and elbow pain along with numbness (Docket No. 11, p. 1342 of 1433). This time, Plaintiff had a positive Finkelstein test bilaterally as well as significant tenderness over her elbow (Docket No. 11, p. 1342 of 1433). Hospital staff recommended an EMG nerve conduction test (Docket No. 11, p. 1342 of 1433). Plaintiff underwent this test on November 18, 2009 (Docket No. 11, pp. 1339, 1341 of 1433). The test results were normal (Docket No. 11, pp. 1339, 1341 of 1433).

Less than one week later Plaintiff returned to the ER complaining of abdominal pain (Docket No. 11, p. 1321 of 1433). At this time, Plaintiff denied any neurological or musculoskeletal problems (Docket No. 11, p. 1322 of 1433). Plaintiff had moderate abdominal tenderness and was diagnosed with cholecystitis and constipation (Docket No. 11, p. 1322 of 1433). Plaintiff returned to the ER

---

[9] A Finkelstein test is a diagnostic test whereby the patient tucks the thumb in a closed fist and the examiner deviates the fist ulnarly. Pain indicates a positive result. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

approximately ten days later complaining of bilateral wrist and radiating elbow pain (Docket No. 11, p. 1319 of 1433). Plaintiff denied any neck pain (Docket No. 11, p. 1319 of 1433). Hospital records indicate Plaintiff had significant medial epicondyle tenderness bilaterally (Docket No. 11, p. 1319 of 1433).

On December 7, 2009, Plaintiff met with Dr. Sameer Mahesh, MD ("Dr. Mahesh") to discuss the possibility of discontinuing  Coumadin (Docket No. 11, p. 1242 of 1433). Dr. Mahesh recommended that Plaintiff continue Coumadin long-term, given her history of DVT (Docket No. 11, p. 1242 of 1433). On that same date, Plaintiff met with Dr. Mihal Emberton, MD ("Dr. Emberton") who suggested that Plaintiff embark on a weight loss and nutrition program as part of her treatment regimen (Docket No. 11, p. 1304 of 1433).

On February 23, 2010, Plaintiff reported to the Akron General ER complaining of "whole body swelling" (Docket No. 11, p. 1307 of 1433). Plaintiff had right-sided leg tenderness without any swelling (Docket No. 11, p. 1307 of 1433). Plaintiff also denied any incidents of falling unexpectedly (Docket No. 11, p. 1311 of 1433). At the time of her discharge, Plaintiff's pain was zero out of a possible ten (Docket No. 11, p. 1312 of 1433). Plaintiff underwent a bilateral lower extremity venous duplex sonogram on February 24, 2010, which showed no evidence of DVT in either leg (Docket No. 11, p. 1317 of 1433). Diagnostic studies failed to show a definitive area of pathology (Docket No. 11, p. 1320 of 1433).

On March 25, 2010, Plaintiff had an MRI of her cervical spine, which revealed minimal disc bulging with borderline central canal stenosis at her C3-4 vertebrae and diffuse disc bulging and possible endplate osteophyte formation at her C4-5 vertebrae (Docket No. 11, p. 1412 of 1433). The test also showed a possible narrowing at Plaintiff's C5-6 vertebrae (Docket No. 11, p. 1412 of 1433).

On April 22, 2010, Plaintiff Saw Dr. AnnElise Collier, MD ("Dr. Collier") (Docket No. 11, p. 1417 of 1433). Dr. Collier diagnosed Plaintiff with back pain and anxiety (Docket No. 11, p. 1418 of 1433).

**C.    EVALUATIONS**

**1.    OCCUPATIONAL MEDICINE EXAMINATION**

Plaintiff underwent a one-time Occupational Medicine Examination with Dr. Kevin Trangle, MD ("Dr. Trangle") at the request of CIME Management on March 20, 2008 (Docket No. 11, pp. 596-600 of 1433). Dr. Trangle confirmed Plaintiff's diagnosis of bilateral carpal tunnel syndrome, which he opined was the direct result of her job as a medical biller (Docket No. 11, p. 599 of 1433). At the time of this evaluation, Plaintiff denied having any other medical problems (Docket No. 11, p. 598 of 1433).

**2.    MENTAL HEALTH FUNCTIONING DISABILITY ASSESSMENT REPORT**

On July 23, 2008, Plaintiff underwent, at the request of the Bureau of Disability Determination ("BDD") a one-time evaluation to determine her mental health functioning with Dr. Sudhir Dubey, PsyD ("Dr. Dubey") (Docket No. 11, pp. 1085-90 of 1433). Plaintiff attended the session alone and was able to drive herself to the appointment (Docket No. 11, p. 1085 of 1433). Plaintiff reported being depressed for several years and having daily mood swings, crying spells, weight gain, and sleeping difficulties (Docket No. 11, p. 1087 of 1433). Plaintiff also reported having feelings of anxiety three out of seven days, as well as feelings of guilt and hopelessness (Docket No. 11, p. 1087 of 1433). Plaintiff stated that she spent her days managing her home and doing basic activities such as cooking, laundry, cleaning, watching television, and looking for work (Docket No. 11, p. 1087 of 1433). The report also found that Plaintiff could appropriately bathe, dress, and perform personal hygiene routines on her own (Docket No. 11, p. 1087 of 1433). Her cognitive functioning was estimated to be in the

low-average range (Docket No. 11, p. 1088 of 1433). Dr. Dubey assigned Plaintiff a Global

Assessment of Functioning ("GAF") score of 70[10] (Docket No. 11, p. 1089 of 1433).

Dr. Dubey found Plaintiff to have no impairment with regard to her mental ability to: (1) relate

to others; (2) maintain attention, concentration, persistence, and pace when performing simple

repetitive tasks; and (3) withstand stress and pressure associated with day-to-day work activity (Docket

No. 11, p. 1089 of 1433). Plaintiff was found to have only a mild impairment with regard to her ability

to understand, remember, and follow instructions (Docket No. 11, p. 1089 of 1433).

### 3.    MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Less than one month later, on August 15, 2008, Plaintiff underwent a Mental Residual

Functional Capacity Assessment with Dr. Sabin (Docket No. 11, p. 1235 of 1433). Contrary to Dr.

Dubey's findings, Dr. Sabin found Plaintiff to be markedly limited in several categories, including

Plaintiff's ability to: (1) remember locations and work-like procedures; (2) understand and remember

very short and simple instructions; (3) understand and remember detailed instructions; (4) carry out

detailed instructions; (5) maintain attention and concentration for extended periods; (6) perform

activities within a schedule; and (7) complete a normal workday and work-week without interruptions

from psychologically-based symptoms and to perform at a constant pace without an unreasonable

number and length of rest periods (Docket No. 11, p. 1235 of 1433). Dr. Sabin also found Plaintiff to

be moderately limited in her ability to: (1) carry out very short and simple instructions; (2) make

simple work-related decisions; (3) accept instructions and respond appropriately to criticism from

---

[10] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

supervisors; (4) respond appropriately to changes in the work setting; (5) travel in unfamiliar places or use public transportation; and (6) set realistic goals or make plans independently of others (Docket No. 11, p. 1235 of 1433). Based on these results, Dr. Sabin determined Plaintiff to be unemployable (Docket No. 11, p. 1235 of 1433).

### 4. PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On that same date, Dr. Sabin also performed a Physical Residual Functional Capacity Assessment (Docket No. 11, pp. 1239-40 of 1433). Dr. Sabin determined that Plaintiff could: (1) never lift and/or carry any weight; (2) could only stand/walk for less than one hour per day, with or without interruption; and (3) could only sit for less than one hour per day, with or without interruption (Docket No. 11, p. 1240 of 1433). Dr. Sabin found Plaintiff to be extremely limited in her ability to bend and engage in repetitive foot movement, markedly limited in her ability to push/pull and reach, and moderately limited in her ability to handle objects (Docket No. 11, p. 1240 of 1433). Dr. Sabin expected these conditions to last for twelve months or more (Docket No. 11, p. 1240 of 1433).

### 5. PSYCHIATRIC REVIEW TECHNIQUE

Plaintiff underwent a Psychiatric Review Technique with State agency evaluator Dr. William Benninger, Ph.D. ("Dr. Benninger") on August 25, 2008 (Docket No. 11, pp. 1091-1104 of 1433). Dr. Benninger determined that Plaintiff suffered from an adjustment disorder with depression and chronic anxiety (Docket No. 11, p. 1094 of 1433). In assessing "Paragraph B" criteria,[11] Dr. Benninger found Plaintiff to have mild limitation with regard to restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace

---

[11] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

24

(Docket No. 11, p. 1101 of 1433). There were no episodes of decompensation (Docket No. 11, p. 1101 of 1433). Dr. Benninger did not find the presence of any "Paragraph C" criteria[12] (Docket No. 11, p. 1102 of 1433).

### 6.   SECOND PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff underwent a second Physical Residual Functional Capacity Assessment with State agency physician Dr. W. Jerry McCloud, MD ("Dr. McCloud") on August 27, 2008 (Docket No. 11, pp. 1105-12 of 1433). Dr. McCloud determined that Plaintiff could: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk with normal breaks for a total of six hours during an eight-hour workday; (4) sit with normal breaks for a total of six hours during an eight-hour workday; and (5) perform unlimited pushing and/or pulling (Docket No. 11, p. 1106 of 1433). Dr. McCloud also reported that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (Docket No. 11, pp. 1107-09 of 1433).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42

---

[12] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same

definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI

claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time

he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th

Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at

730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do

basic work activities." *Id.* (*citing Abbott*, 905 F. 2d at 923).  At the third step, a claimant is presumed to

be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment

meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual

functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity

is an administrative "assessment of [the claimant's] physical and mental work abilities – what the

individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS

126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum*

remaining ability to do sustained work activities in an ordinary work setting on a **regular and**

**continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an

equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996

SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner

must next determine whether the claimant has the residual functional capacity to perform the

requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant

is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Kleber made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013.

2. Plaintiff has not engaged in substantial gainful activity since May 22, 2008, the alleged onset date.

3. Plaintiff has the following severe impairments: degenerative disc disease of the cervical spine, decompression, anxiety, obesity, impairment of her bilateral upper extremities related to Plaintiff's history of bilateral upper extremity deep vein thrombosis and pulmonary embolism, reflex sympathetic dystrophy of the right hand, and carpal tunnel syndrome.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1.

5. Plaintiff has the residual functional capacity to perform light work subject to the following limitations: (1) work must not require operating hand controls, climbing ladders or scaffolds, or balancing; (2) work cannot require stooping, kneeling, crouching, or crawling on anything more than an occasional basis; (3) work can only involve simple tasks, defined as being one to three steps, each describable in one sentence; (4) work must be goal-oriented, as opposed to production-rate pace; (5) work cannot involve interaction with the public for any more than two minutes at a time for and for no more than thirty minutes of the workday; and (6) work

27

cannot involve any more than occasional contact with coworkers, defined as contact of less than ten minutes at a time for no more than one-third of the workday.

6.     Plaintiff is unable to perform any past relevant work.

7.     Plaintiff was born on November 28, 1961, and was 46 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.

8.     Plaintiff has at least a high school education and is able to communicate in English.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled" whether or not Plaintiff has transferable job skills.

10.    Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.    Plaintiff has not been under a disability, as defined in the Social Security Act, from May 22, 2008, through the date of this decision.

(Docket No. 11, p. 14-29 of 1433). ALJ Kleber denied Plaintiff's request for DIB and SSI benefits

(Docket No. 11, p. 28 of 1433).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-

33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's

conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27

(6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial

evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A. PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff alleges: (1) the ALJ erred by violating the treating physician rule and not assigning great weight to the opinion of Plaintiff's alleged treating physician, Dr. Sabin; and (2) the ALJ erred by failing to properly incorporate Plaintiff's established limitations into her residual functional capacity finding (Docket No. 15).

### B. DEFENDANT'S RESPONSE

Defendant contends that: (1) the ALJ was not required to accept the opinion of Dr. Sabin because Dr. Sabin cannot be considered a treating physician, and, even if she were, her opinion was inconsistent with the overall medical record; and (2) the ALJ was not required to include additional restrictions in her residual functional capacity assessment (Docket No. 16).

### C. DISCUSSION

#### 1. TREATING PHYSICIAN RULE

29

The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).
>
> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.
>
> [T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted). Here, ALJ Kleber completely discounted the

opinion of Plaintiff's alleged treating physician, Dr. Sabin, stating "Dr. Sabin's treatment notes

generally reflect the claimant's subjective complaints, but do not indicate objective clinical findings

consistent with the severe limitations of the claimant's functioning she suggests" (Docket No. 11, p. 23

of 1433).

Before according any weight to the opinions of a claimant's physicians, the ALJ must first determine which of a claimant's physicians, if any, are to be considered "treating sources." "A physician is a treating source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation that is typical for the treated conditions." *Blakley*, 581 F.3d at 407 (*quoting* 20 C.F.R. § 404.1502) (internal quotations omitted)). According to ALJ Kleber, "the evidence does not indicate that Dr. Sabin had a treatment relationship with the claimant at the time she rendered her opinions" (Docket No. 11, p. 23 of 1433). A review of the submitted medical records reveals that Plaintiff began seeing Dr. Sabin in December 2006, with Plaintiff's last visit being on May 19, 2008 (Docket No. 11, pp. 818, 1023 of 1433). During that span of time, Plaintiff saw Dr. Sabin a total of five times (Docket No. 11, pp. 745, 818, 828, 841, 1023, 1059 of 1433). By comparison, Plaintiff saw her neurosurgeon, Dr. Donich, a total of eighteen times and visited the Akron General ER a total of twelve times during that same time period (Docket No. 11, pp. 326-1433 of 1433).

Social Security Regulations specifically state that the Commissioner will "consider an acceptable medical source who has treated or evaluated [a claimant] only a few times or only after long intervals . . . to be [a] treating source if the nature and frequency of the treatment or evaluation is typical for [the] condition." 20 C.F.R. § 404.1502. Dr. Sabin is a general family practitioner (Docket No. 11, p. 842 of 1433). Based on Plaintiff's lengthy list of complaints and alleged impairments and multiple emergency room visits, it is reasonable to conclude that Plaintiff would seek attention from her own family doctor on more than five occasions during an eighteen-month period. Instead, the record shows that Plaintiff usually opted to visit the emergency room rather than seek treatment from

31

Dr. Sabin (Docket No. 11, pp. 326-1433 of 1433). Therefore, this Magistrate finds that Dr. Sabin was not Plaintiff's treating physician and her opinion regarding Plaintiff's residual functional capacity is not entitled to controlling weight under the treating physician's rule.

Even if this Court were to consider Dr. Sabin to be Plaintiff's treating physician, her opinion is still not entitled to controlling weight. An "ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Blakley*, 581 F.3d at 406-07 (*citing Wilson*, 378 F.3d at 544). After only five visits, Dr. Sabin's conclusions as to Plaintiff's residual functional capacity are both extreme and at odds with the bulk of Plaintiff's medical record.

Dr. Sabin concluded that Plaintiff could stand/walk and sit, without interruption, for only less than one hour during an eight-hour workday (Docket No. 11, p. 1240 of 1433). This limitation was reiterated by Plaintiff during her July 2010 testimony (Docket No. 11, pp. 59-61 of 1433). Although it is clear, both in the ALJ's decision and in Plaintiff's extensive medical record that Plaintiff suffers from some level of back, neck, and wrist/hand pain, there is nothing to suggest that Plaintiff needs to constantly change position (Docket No. 11, pp. 326-1433 of 1433). Plaintiff applied for, and was denied benefits on two prior occasions for complaints similar to her current application (Docket No. 11, pp. 84, 178, 184 of 1433). After both denials, Plaintiff returned to work. When asked by ALJ Kleber why she left her last job, Plaintiff stated she was allegedly fired for saying "excuse me" to a coworker, not for being unable to do her job (Docket No. 11, p. 43 of 1433). In fact, during her interview with Dr. Dubey on July 23, 2008, Plaintiff indicated that she was looking for work (Docket No. 11, p. 1087 of 1433). Despite Plaintiff's continued complaints of pain, there is nothing in the

32

record, aside from Plaintiff's own subjective statements, to indicate that she cannot physically stand, walk, or sit for any length of time (Docket No. 11, pp. 326-1433 of 1433).

Dr. Sabin also concluded that Plaintiff was extremely limited in her ability to bend and engage in repetitive foot movement and was markedly limited in her ability to push/pull and reach (Docket No. 11, p. 1240 of 1433). Again, there is nothing in the record to suggest such severe restriction. An examination from May 25, 2008, revealed a normal range of motion in Plaintiff's spine (Docket No. 11, p. 825 of 1433). On February 17, 2009, Plaintiff denied having any cervical motion tenderness (Docket No. 11, p. 1361 of 1433). On June 12, 2009, an examination revealed that Plaintiff was able to flex her neck to touch her chin to chest, could rotate her head completely to the left, and had only some limitation when rotating to the right (Docket No. 11, p. 1350 of 1433). During a November 24, 2009, visit to the Akron General ER, Plaintiff denied having any neurological or musculoskeletal problems (Docket No. 11, p. 1322 of 1433).

Additionally, Plaintiff underwent bilateral carpal tunnel release surgery in January and February 2008 (Docket No. 11, pp. 676, 683, 1035, 1037, 1171, 1173 of 1433). In February 2008, Plaintiff reported "experienc[ing] significant resolution of her symptoms" (Docket No. 11, pp. 983, 1121 of 1433), and by May 2008, Plaintiff reported that the physical therapy was helping her "significantly" (Docket No. 11, pp. 979, 1117 of 1433). By July 15, 2008, Plaintiff was reporting an increase in her hand pain, rating it as a ten out of ten, but less than two weeks later, Plaintiff was discharged from physical therapy for attendance issues (Docket No. 11, p. 1197 of 1433). Subsequent visits to the emergency room for wrist/hand pain revealed that Plaintiff was not using her night splints as directed (Docket No. 11, p. 1349 of 1433). In June 2009, Plaintiff was found to have normal grip and wrist strength (Docket No. 11, p. 1350 of 1433).

33

Furthermore, Plaintiff underwent a second physical residual functional capacity assessment less than two weeks after her assessment with Dr. Sabin (Docket No. 11, pp. 1105-12 of 1433). State agency physician Dr. McCloud found Plaintiff to be capable of medium-level exertion (Docket No. 11, pp. 1105-12 of 1433). Although the ALJ accorded Dr. McCloud's opinion less than full weight given his failure to account for some of Plaintiff's complaints regarding her hand and wrist pain, the vast difference between Dr. McCloud's opinion and Dr. Sabin's opinion cannot be missed. Plaintiff alleges that Dr. Sabin was in the best position to provide a residual functional capacity assessment because she both examined Plaintiff and had access to "numerous test results, surgery procedures, and examination findings" (Docket No. 15, p. 17 of 22). However, Dr. McCloud had access to this same data and arrived at a nearly opposite conclusion.

The lack of objective medical evidence also holds true for Plaintiff's mental residual functional capacity assessment. Dr. Sabin found Plaintiff to be both markedly and moderately limited in more than half of the assessed categories (Docket No. 11, p. 1235 of 1433). Nothing in Plaintiff's record suggests such drastic limitation (Docket No. 11, pp. 326-1433 of 1433). Furthermore, *none* of Dr. Sabin's own medical records regarding the Plaintiff contain information concerning Plaintiff's mental status and/or ability (Docket No. 11, pp. 828, 841, 1023, 1159 of 1433).

Therefore, *even if* Dr. Sabin could be considered Plaintiff's treating physician, the ALJ was correct, based on the objective medical evidence, in assigning her opinion less than controlling weight. It is the recommendation of this Magistrate that the ALJ's opinion be affirmed.

### 2. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff also alleges that the ALJ failed to incorporate established limitations into her

34

assessment of Plaintiff's residual functional capacity (Docket No. 15, pp. 18-22 of 22). To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id.* Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). Residual functional capacity "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). Before making a final determination a claimant is not disabled, the Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual

functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

In the present case, ALJ Kleber found, based upon consideration of the entire record, that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 416.927 and 416.929 (Docket No. 11, p. 20 of 1433).[13] The ALJ further reduced Plaintiff's work capability by adding significant limitations, stating

> she can perform work that does not require operating hand controls, or climbing ladders or scaffolds, or balancing. She can perform work which requires stooping, kneeling, crouching and crawling no more than occasionally. She can perform work involving simple tasks, defined as being of one to three steps, each describable in one sentence. She can perform work that is goal oriented, as opposed to production rate pace work. She can perform work that involves no interaction with the public, defined as being around members of the public during the workday, but only for contact of less than 2 minutes at a time for no more than 30 minutes of the workday. And she can perform work that involves no more than occasional contact with co-workers, defined as being around co-workers during the workday, but only for contact of less than 10 minutes at a time for no more than 1/3 of the workday.

(Docket No. 11, p. 20 of 1433).

It is clear from the ALJ's opinion that she considered the medical evidence in its entirety before arriving at her conclusion. Despite Plaintiff's extensive list of allegedly debilitating impairments, the ALJ could simply not square these allegations with the factual record. Plaintiff testified that she could not work because of her "back, . . . neck, and . . . arms and hands" (Docket No. 11, p. 43 of 1433). However, as ALJ Kleber pointed out, Plaintiff continued to work even after the onset of her disabilities (Docket No. 11, p. 31 of 1433). Even though Plaintiff placed her disability onset date as May 22, 2008, the majority of Plaintiff's medical record contains information *prior* to that date, during a time in

---

[13] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b).

which Plaintiff was involved in substantial gainful activity (Docket No. 11, pp. 326-1433 of 1433).

Furthermore, even after Plaintiff stopped working, her treatment was generally conservative in nature.

Plaintiff was prescribed physical therapy, from which she was discharged due to intermittent

attendance (Docket No. 11, p. 1197 of 1433). Plaintiff was otherwise treated only with pain medication

and was told she was not a surgical candidate (Docket No. 11, pp. 910, 1304-1433 of 1433).

More specifically, Plaintiff alleges that the ALJ erred by not including the use of a cane as a

limitation in her hypothetical to the VE (Docket No. 15, pp. 17-22 of 22). In the Sixth Circuit, a VE's

testimony must be based on a hypothetical question which accurately portrays the claimant's physical

and mental impairments. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir.

1987). This evidence may only be used as substantial evidence of a claimant's residual functional

capacity when that testimony is in response to a hypothetical question that "accurately portrays [the

claimant's] individual physical and mental impairments." *Davis v. Sec'y of Health & Human Servs.*,

915 F.2d 186, 189 (6th Cir. 1990). However, it is also "well established that an ALJ . . . is required to

incorporate only those limitations accepted as credible by the finder of fact" into the hypothetical

question. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, there is no evidence, other than Plaintiff's testimony, that Plaintiff required the use of a

cane. During her testimony, Plaintiff alleged that she was prescribed the cane first by Dr. Donich and

subsequently by an unidentified nurse practitioner (Docket No. 11, p. 46 of 1433). There is no

evidence in the record that Dr. Donich, or any other medical professional, for that matter, prescribed

Plaintiff a cane (Docket No. 11, pp. 326-1433 of 1433). Plaintiff herself undermined her testimony on

numerous occasions. On February 12, 2007, Plaintiff told Dr. Donich that, although she feels like her

right leg may give out, she could walk *at least* one-quarter of a mile, and made no indication that she

would need a cane to do so (Docket No. 11, pp. 999, 1135 of 1433). Similarly, in December 2007, Plaintiff told Dr. Donich that she could walk a mile, and again made no mention of needing a cane (Docket No. 11, pp. 986, 1124 of 1433). Even more telling is a February 24, 2010, visit to the Akron General ER during which Plaintiff denied falling unexpectedly (Docket No. 11, p. 1311 of 1433). Neither Dr. McCloud nor Dr. Sabin made any mention of Plaintiff's use of a cane in their respective residual functional capacity assessments (Docket No. 11, pp. 1105-12, 1239-40 of 1433).

Furthermore, "to find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." 1996 SSR LEXIS 6, *19 (July 2, 1996). There simply is no objective medical information warranting Plaintiff's use of a cane. This Magistrate find that the ALJ was correct in excluding the use of a cane in her determination of Plaintiff's residual functional capacity and therefore recommends the ALJ's decision be affirmed.

A brief word must be said about Plaintiff's allegation that the ALJ failed to include an additional restriction, proffered by Plaintiff's counsel to the VE, in her assessment of Plaintiff's work ability. During cross-examination, Plaintiff's counsel stated, "[i]f the Claimant were off task given any of the hypotheticals, say, at least 15% of the time because of needing to lie down or breaks or missing work or whatever, would any of the [other work] be available or . . . performed by such a Claimant?" (Docket No. 11, p. 75 of 1433). The VE stated that, given this limitation, it would be difficult for such an individual to maintain full-time employment (Docket No. 11, p. 75 of 1433). It is true that ALJ Kleber did not incorporate this limitation into her residual functional capacity assessment (Docket No. 11, p. 20 of 1433), and for good reason. There is no indication, anywhere in the medical record, that Plaintiff would need to be off task at least fifteen percent of the time as a result of her medical

38

impairments (Docket No. 11, pp. 326-1433 of 1433). Plaintiff's allegation is without merit.

## VIII. Conclusion

For the foregoing reasons, this Magistrate recommends that the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   February 6, 2013

## IX. Notice

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the Local Rules for Northern District of Ohio, any

party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.